UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>                    vs.<br><br>COLBY HAGGERTY,<br><br>                    Defendant. | 5:14-CR-50046-JLV<br><br>REPORT AND RECOMMENDATION |

Pending is Defendant's Motion to Suppress Evidence (Doc. 58).  A hearing was held on July 31, 2015.  Defendant was personally present and represented by his attorney of record, George Grassby.  The Government was represented by Sarah B. Collins and Eric Kelderman. Four witnesses testified at the hearing. Thirteen exhibits were received into evidence.  Both parties have submitted briefs and oral argument was heard at the conclusion of the hearing. Based on a careful consideration of all the evidence, and counsel's written and oral arguments, the court respectfully makes the following findings of fact and conclusions of law.

## JURISDICTION

Defendant is charged in an Indictment with Receipt of Child Pornography in violation of 18 U.S.C. § 2252A(a)(2)(A) and Possession of Child Pornography in violation of 18 U.S.C. § 2252A(a)(5)(B).  The pending Motion was referred to this magistrate judge for the holding of an evidentiary hearing and the issuance

1

of a recommended disposition pursuant to 28 U.S.C. § 36(b)(1)(B) and the

March 9, 2015, standing order of the Honorable Jeffrey L. Viken, Chief Judge.

## **FACTUAL BACKGROUND**

Colby Haggerty is accused of receiving and possessing child pornography

that he downloaded by engaging in peer-to-peer file sharing by way of the

"BitTorrent Network." On several dates between September 2013 and March

2014, Detective Kelvin Masur, of the Internet Crimes Against Children

Taskforce (ICAC) was monitoring the download of files suspected of containing

child pornography. He found a particular Internet Protocol address ("IP

address") associated with torrents containing files with names clearly

suggestive of child pornography. At the hearing, Detective Masur testified that

after observing the activity of the specific IP address, he attempted a "single

source download" of one of the torrents from that IP address and was

unsuccessful. (FTR at 10:50 a.m.). Defense witness, Daniel Meinke, a computer

forensic examiner, testified that if law enforcement is unsuccessful at obtaining

the download directly from the IP Address, they typically would look at the

"hash value" of the files being shared. The hash value is "like the DNA of a

digital file" and is known to be so accurate that "no two files have been known

to share the same hash value." (FTR at approx. 8:49 a.m). Law enforcement

has databases to check the hash values of files to verify the content of the file.

This testimony was echoed by Detective Masur when he described the actions

he took to verify that the files in question were child pornography. (FTR at

approx. 11:03 a.m.). However, Detective Masur did not check the hash values

of the files to verify content before requesting a warrant. (FTR at approx. 11:46 a.m.). Instead, he believed the files were likely child pornography because of the file names. (Id.) Using Maxmind.com, a website that locates the geographical location of an IP address, the agents determined that the Internet Service Provider ("ISP") for the IP Address was Midcontinent Communications ("Midco").

On March 3, 2014, Lara Roetzel, Chief Deputy State's Attorney, subpoenaed Midco to appear before the Pennington County Grand Jury on March 12, 2014. (Doc. 58, Exhibit 2). Alternatively, the subpoena could be satisfied if Midco delivered documents or records to the Pennington County State's Attorney's Office pertaining to "any and all subscriber information to include subscriber name, subscriber address, subscriber phone number... as well as IP connection log data for dates 9/11/13 through 2/24/14" for the IP address that was associated with the torrents. (Doc. 58, Exhibit 2). Midco subsequently delivered the requested information, which was then opened in front of the grand jury.[1] The information revealed that the subscriber of the IP address was Colby Haggerty who resided in a dorm room at Ellsworth Air Force Base.

On April 16, 2014, members of the Internet Crimes Against Children taskforce (hereinafter "ICAC") went to Mr. Haggery's physical address at Ellsworth. (Doc. 58, Exhibit 4, ¶11). The members of ICAC present were Detective Russ Eisenbraun, Investigator Johnathan Kirk, and Investigator

---

[1] Masur testified that Midco responded to the subpoena and Ms. Roetzel opened the documents in front of the grand jury. (FTR at approx. 11:04:30)

Kelvin Masur. (Doc. 58 at Exhibit 1, p. 2). When the group arrived, Mr. Haggerty's First Sergeant, Master Sergeant Stephanie Martinez, told them that she had already contacted Mr. Haggerty and he was inside of his residence. (Doc. 58 at Exhibit 4, ¶11).

Inside the residence, Detective Masur introduced the team of investigators. He also informed Mr. Haggerty that they were all from ICAC. (Govt. Exhibit 2 at p.1).  Detective Masur asked if they "[could] come in and talk to [him] for a few minutes." (Id.) Detective Masur and Mr. Haggerty engaged in some small talk, discussing the size of Mr. Haggerty's dorm room. Detective Masur expressed surprise that the dorm room was not larger. Detective Masur then said, "[H]ere's the deal. I'd like to talk to ya in private. I thought we'd have a room to do that. Can we go outside here and I can chat with ya for a little bit and I'll tell ya what's goin' on and we can kind of take it step by step from there?" (Id.) Mr. Haggerty responded, "yeah sure. Sure." The interview took place in the dorm common area that was much like a living room. (Doc. 58, Exhibit. 4, ¶ 11). The beginning of the interview was very conversational and everyone was pleasant. Mr. Haggerty did not give any indication that anything was out of the ordinary and was even a bit talkative. When Detective Masur requested his contact information, Mr. Haggerty gave him his cell phone number and volunteered his work phone number as well.

Detective Masur told Mr. Haggerty that he was not under arrest, but did not know if he would be arrested "down the road."  (Govt. Exhibit 2 at p.5). He did not immediately tell Mr. Haggerty why the investigators were there, despite

4

Mr. Haggerty's request to know what they were investigating. (Id.) Detective Masur never told Mr. Haggerty that he did not have to speak with them or that he was free to end the questioning. About five minutes into the interview, Detective Masur mentioned Mr. Haggerty's computer set-up. Mr. Haggerty volunteered statements that he was a big gamer, didn't like people touching his belongings, and would be willing to help them go through files as needed.

After another minute of questioning related to peer to peer file sharing, Detective Masur asked Mr. Haggerty how often he came into contact with child pornography in his downloads. (Govt. Exhibit 2 at p. 8). Mr. Haggerty stated that occasionally he would come across child pornography, but delete it. (Id.) Approximately three minutes later, Detective Masur told Mr. Haggerty that the reason investigators were with him was because they were hoping to do a forensic examination on his computer. (Id. at 12). Detective Masur told Mr. Haggerty that he did not have to consent, but it "makes things go a lot easier…" (Id.) He went on to tell Mr. Haggerty that they would like to examine his computer. (Id.) Mr. Haggerty interrupted to ask whether they could examine his computer in his dorm room because he needed his computer to complete school work. (Id.) Detective Masur said that the forensic examiner could do a "preview" of Mr. Haggerty's computer and go from there. (Id. at 12-13). Detective Masur told Mr. Haggerty that the examiner was looking for child pornography. (Id. at 13). Mr. Haggerty responded, "okay." (Id. at 3). Detective Masur explained to Mr. Haggerty that if he had any child pornography on his computer that he should say so before they looked. (Id.) Mr. Haggerty said that

it was possible that there was child pornography on his computer if it was copied to his backup without his knowledge. (Id.)  The "preview" was not effective because Mr. Haggerty possessed multiple hard drives and electronic devices.

Detective Masur also requested to search for other electronic devices Mr. Haggerty owned. (Id. at 14). He asked Mr. Haggerty if he had "consent to search [his] room for those types of devices" and Mr. Haggerty responded, "yes. I can actually show you" and continued to volunteer information about other electronic devices. (Id.) Mr. Haggerty responded to a renewed request to search by responding in the affirmative and that he "just want[s] to make it easier for" them. (Id. at 17).

After the forensic examiner initiated the "preview" Detective Masur spoke with Mr. Haggerty again. Mr. Haggerty responded to Detective Masur's questions stating that he accidentally downloaded child pornography in the past because it was lumped in with music or video files. (Id. at 19). Detective Masur showed Mr. Haggerty an IP address identified as Mr. Haggerty's IP address associated with "info hashes for particular torrents," dates, and times. (Id. at 19-21). He also identified a particular file name suggestive of child pornography. (Id. at 21). Mr. Haggerty responded that he does not look at file names. (Id.)

Mr. Haggerty denied ever distributing child pornography, but said that he was curious whether the file names really depicted what they described and to see if the file was just a virus. (Id. at 22-23). Mr. Haggerty explained that he

6

wanted to practice removing viruses because he worked with "Com-Sec" and his job involved protecting networks. (Id. at 23). Ultimately, Mr. Haggerty made incriminating statements regarding downloading and possessing child pornography.

After the interview, Detective Masur said that the team would request a search warrant to seize the electronics and conduct a thorough forensic examination. (Id. at 30). Mr. Haggerty wanted to know if he would get his electronics back and Detective Masur said that if child pornography was found, he would probably never get his electronics back. (Id. at 32).

Detective Masur left to prepare a search warrant. In Detective Masuer's absence, Agent Kirk had Mr. Haggerty wait in the front passenger seat of his vehicle. Agent Kirk and Mr. Haggerty waited for approximately 40-45 minutes during which time they chatted about personal matters such as Mr. Haggerty's family, his experience in the military, etc.

Detective Masur called Agent Kirk to advise that he planned to ask for Mr. Haggerty's consent to remove the item from the dorm room. Detective Masur then called Mr. Haggerty, while Mr. Haggerty was seated in Agent Kirk's patrol car. Detective Masur requested Mr. Haggerty's permission to search his dorm room for anything that could save or store digital media or photographs and seize them. Mr. Haggerty again gave consent. (Govt. Exhibit 4 at p.3).

On April 17, 2014, Detective Masur sought a search warrant from United States Magistrate Judge Veronica L. Duffy for the search of "various

computers, external & internal hard drives, flash drives, & cell phone seized 4/16/14" and the search warrant was granted. (Doc. 58, Exhibit 3).

## DISCUSSION

### I. Whether Mr. Haggerty had a Reasonable Expectation of Privacy in his IPAddress

Mr. Haggerty first argues that the agents had no search warrant authorizing the discovery of his IP address. (Doc. 58, p. 5). His theory is that Officer Masur had no legal authority to access the "BitTorrent Network" that Mr. Haggerty was using to allegedly download child pornography. Moreover, he argues that Detective Masur had no legal authority to use Maxmind.com, a website used to find the geographical location of an individual with a specific IP address. Mr. Haggerty argues that, without a warrant authorizing the search of the above, the IP address, the geographical location, and the torrents, along with any information derived from the discovery of this information, should be suppressed. He alleges that absent a warrant, Detective Masur violated SDCL Section 43-43B-1 or "Unlawful uses of computer system" by essentially gaining access to Mr. Haggerty's computer and obtaining information from his computer without his consent.

To prove the existence of a "constitutionally cognizable privacy interest," the defendant must show "(1) he 'has a reasonable expectation of privacy in the areas searched or the items seized,' and (2) 'society is prepared to accept the expectation of privacy as objectively reasonable.'" United States v. Wheelock, 772 F.3d 825, 828 (8th Cir. 2014) (citing United States v. James, 534 F.3d 868, 872-73 (8th Cir. 2008). An individual generally has a reasonable expectation of

privacy in his personal computer. United States v. Stults, 575 F.3d, 834, 843 (8th Cir. 2009) (citing United States v. Ganoe, 538 F.3d 1117, 1127 (9th Cir. 2008). However, when that individual downloads a file-sharing program that makes files accessible to others, that reasonable expectation of privacy is lost. Stults, 575 F.3d at 843 (by downloading a file sharing program "Stults opened up his download folder to the world, including [the agent]").

Thus, Mr. Haggerty had no reasonable expectation of privacy in his IP address, the geographical location of his IP address, or the files suggestive of child pornography and Detective Masur did not need a warrant to obtain the information he collected. Mr. Haggerty's theory that Detective Masur needed authority to access torrents and Mr. Haggerty's IP address and location fail because of the public nature of torrents, IP addresses, and finding the geographic location of an IP address. "The BitTorrent Network" may be used by anyone to download publicly available files. This is also why Mr. Haggerty's theory that Detective Masur accessed his computer without consent fails. No consent was needed because of the public nature of peer to peer file sharing.

## II. Whether Probable Cause Existed to Support the Search Warrant

Mr. Haggerty next argues that the search warrant lacked facts supporting probable cause to seize and search Mr. Haggerty's electronic devices. He lists several facts that he claims were missing from the analysis.

A search warrant is valid under the Fourth Amendment if it is supported by probable cause. United States v. Wallace, 550 F.3d 729, 732 (8th Cir. 2008). Probable cause is present if, "under the totality of the circumstances, a

showing of facts can be made 'sufficient to create a fair probability that evidence of a crime will be found in the place to be searched.'" Id. (citing United States v. Underwood, 364 F.3d 880, 883 (8th Cir. 2002)). When a judge issues a warrant, "great deference" should be given to that judge's probable cause determination. Stults, 575 F.3d at 843 (citing United States v. Kattaria, 553 F.3d 1171, 1175 (8th Cir. 2009)). "Where there is no evidentiary hearing before the magistrate judge, the probable cause determination must be based upon only that information which is found within the four corners of the affidavit." Stults, 575 F.3d at 843 (quoting United States v. Olvey, 437 F.3d 804, 807 (8th Cir. 2006)). A defendant must show by "the preponderance of the evidence that the search warrant was not supported by probable cause." United States v. Malek, No. CR. 14-40125, 2015 WL 5494183, *7 (D.S.D Sept. 14, 2015) (citing United States v. Chaar, 137 F.3d 359, 363 (6th Cir. 1998)).

Here, there was probable cause to issue the search warrant. Though the affidavit does not describe how Mr. Haggerty's IP address was associated with particular torrents, it states that a particular IP address was associated with specific torrents. Those torrents had file names clearly suggestive of child pornography. Law enforcement used a website to discover the Internet Service Provider for the IP address associated with the torrents.  The Internet Service Provider, Midco, disclosed Mr. Haggerty's subscriber information, including his physical residence, after being served with an administrative subpoena. Agents went to Mr. Haggerty's physical residence where he admitted that he had downloaded child pornography. From Detective Masur's experience in ICAC, he

knew that pornography is often downloaded onto multiple electronic devices and multiple devices and external hard drives should be seized and searched. (Doc. 58, Exhibit. 4, p.7). Detective Masur provided an affidavit containing these facts along with his application for a search warrant.  United States Magistrate Judge Veronica L. Duffy issued the search warrant after determining that probable cause existed. The issuing judge is entitled to great deference. Based on the totality of the circumstances, the warrant was supported by probable cause.

### III.  Whether Mr. Haggerty is entitled to a Franks hearing.

Mr. Haggerty argues that Detective Masur intentionally omitted information from the search warrant affidavit which resulted in a misleading affidavit. He provides a list of the facts he believes should have been included in the affidavit.  In his motion, Mr. Haggery requests an evidentiary hearing pursuant to Frank v. Delaware, 438 U.S. 154, 171 (1978).

As a preliminary matter, a defendant is only entitled to a Franks hearing if he makes a substantial showing that an affiant to a search warrant application knowingly or intentionally, or with reckless disregard for the truth, made false statements or omitted material facts and that the alleged statements were necessary to a finding of probable cause.  Franks v. Delaware, 438 U.S. 154, 155-56 (1978).  "Whether [the defendant] will prevail at that hearing is, of course, another issue." Id. at 172.

The Fourth Amendment requires that a search warrant may be issued only upon a showing of probable cause.  United States v. Williams, 477 F.3d

554, 557 (8th Cir. 2007).  In order to challenge a finding of probable cause under Franks, a defendant must show, by a preponderance of the evidence, that (1) the affiant, in preparing the search warrant affidavit, deliberately and knowingly, or with reckless disregard for the truth, included falsehoods; and (2) the affidavit lacks sufficient content to support a finding of probable cause if the challenged information is set aside.  Franks, 438 U.S. at 171-72; United States v. Humphreys, 982 F.3d 254, 259 n.2 (8th Cir. 1992).  The defendant's challenge must be more than conclusory and must be supported by the evidence.  Franks, 438 U.S. at 171.  The defendant must specify which parts of the affidavit are claimed to be false and must provide a statement of supporting reasons or an "offer of proof."  Id.   The same analysis applies to omissions of facts in that the defendant must show (1) that the affiant intentionally or recklessly omitted material facts thereby making the affidavit misleading; and (2) that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause.  Humphreys, 982 F.3d at 259 n.2.

"To show reckless disregard for the truth, we do not look simply at whether a statement included in the affidavit was true; rather, we ask whether, when looking at all the evidence available to the officer, the officer 'must have entertained serious doubts as to the truth of his [or her] statements or had obvious reasons to doubt the accuracy of the information he [or she] reported.'" United States v. Neal, No. 07-1941, at *4 (8th Cir. June 16, 2008) (quoting United States v. Schmitz, 181 F.3d 981, 986-987 (8th Cir. 1999) (quoting United States v. Clapp, 46 F.3d 795, 801 n.6 (8th Cir. 1995)) (alterations in

original).  Under this standard, "every fact recited in the warrant affidavit [need not] necessarily [be] correct."  United States v. Buchanan, slip op. 08-3515 (8th Cir. July 27, 2009) (quoting Franks, 438 U.S. at 165).

An affidavit submitted in support of a search warrant carries a presumption of validity.  Neal at *5 (citing Franks, 438 U.S. at 171).  Showing that an affiant was negligent or made an innocent mistake is not sufficient to show a Franks violation.  Id.  "Nevertheless, an officer may not circumvent the Franks doctrine by providing only selective information to another officer who is unaware of the full information and therefore includes false information or omits material information from an affidavit in support of a warrant."  Id. (citing United States v. Davis, 471 F.3d 938, 947 n.6 (8th Cir. 2006) (citing Franks, 438 U.S. at 164 n.6) ("where law enforcement authorities are cooperating in an investigation, as here, the knowledge of one is presumed shared by all").  "Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained."  Frank, 438 U.S. at 171.  If the defendant cannot show that probable cause remains lacking even with the supplemental information, then the warrant stands and fruits of the search will not be suppressed. See United States v. Falls, 34 F.3d 674, 681 (8th Cir. 1994).

The defendant has failed to meet his burden to show that Detective Masur omitted material information.  First, many of the statements as described by Mr. Haggerty as omitted facts cannot be described as material. Most of the information Mr. Haggerty asserts as necessary for a probable cause

determination, in fact is superfluous information unnecessary for a court to determine probable cause.  Additionally, some of Mr. Haggerty's purported omitted facts misstate the record.  For example, Mr. Haggerty argues the affidavit fails to state that Mr. Haggerty violated any law, that it omits information regarding intent, or that the images were transported in interstate commerce.   When read as a whole, the affidavit describes Mr. Haggerty's incriminating statements which establish violations of 18 U.S.C. § 2252A, including intent and interstate commerce.

Even if Mr. Haggerty has shown that material information was omitted, he has failed to show that Detective Masur omitted that information intentionally or with reckless disregard for the truth.  Despite Mr. Haggerty's suggested list of omitted facts, probable cause existed to issue the warrant. Therefore, the warrant is valid and Mr. Haggerty is not entitled to a <u>Franks</u> hearing.

**IV.  Whether Mr. Haggerty's Statements Should Be Suppressed**

Mr. Haggerty argues that his statements should be suppressed because he was in custody and was not advised of his <u>Miranda</u> rights and because his statements were given involuntarily. Each argument will be addressed in turn.

**A.   Whether Mr. Haggerty Was in Custody During the Interview**

Mr. Haggerty argues that his statements should be suppressed in part because he was not advised of his <u>Miranda</u> rights. The government alleges that Mr. Haggerty was not in custody and was not entitled to advisement of <u>Miranda</u>

14

rights. It is undisputed that Mr. Haggerty was interrogated and the only issue is whether he was in custody.

An individual is entitled to an advisement of <u>Miranda</u> when that individual is "taken into custody for questioning." <u>United States v. Axsom</u>, 289 F.3d 496, 500 (8th. Cir. 2002) (citing <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966)). <u>Miranda</u> requires that the individual be advised of "his right to be free from compulsory self-incrimination and his right to assistance of counsel." <u>Id</u>.

A suspect is in custody when he is "deprived of his freedom of action in any significant manner." <u>Axsom</u>, 289 F.3d at 500 (citing <u>United States v. Griffin</u>, 922 F.2d 1343, 1347 (8th Cir. 1990)). A court considers the totality of the circumstances in deciding whether "a reasonable person in the suspect's position would have understood his situation to be one of custody." <u>United States v. Anaya</u>, 715 F.Supp.2d 916, 928 (D.S.D. 2010). The determination of whether a subject is in custody considers both "the presence and extent of physical and psychological restraints placed upon the person's liberty during the interrogation." <u>Axsom</u>, 289 F.3d at 500.

<u>United States v. Griffin</u> lists six non-exhaustive factors that are representative of whether an individual is in custody. "(1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests

15

to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; (6) whether the suspect was placed under arrest at the termination of the questioning." 922 F.2d 1343, 1349 (8th Cir. 1990).

Here, Mr. Haggerty was not in custody. As to the first and sixth factors, he was not informed that questioning was voluntary, but he was informed that he was not under arrest. He was also not arrested at the conclusion of the interview. As to the second factor pertaining to his freedom of movement, the interview only lasted about thirty-five minutes[2] and Mr. Haggerty never asked or made an attempt to go anywhere.

Mr. Haggerty also voluntarily acquiesced to Detective Masur's requests to respond to questions. The attitude of an individual goes to showing whether that individual is voluntarily acquiescing to the requests to respond to questions. See, e.g., Axom, 289 F.3d at 501-502 (where defendant voluntarily acquiesced to requests by agents to answer questions as shown by his friendly and cooperative nature during the interview and offer to show agents which of his computers contained child pornography). Mr. Haggerty was friendly and cooperative and even offered to show the agents where all of his electronic devices were located. His cooperative nature suggests that he was voluntarily responding to questioning.

---

[2] The recorded interview was approximately thirty-five minutes. The officers were at Mr. Haggerty's residence from 1419 hours to 1617 hours. However, the statements at issue took place during the thirty-five minute recorded interview.

There is no evidence of strong arm tactics or deceptive stratagems used by the agents. Thus, this factor does not weigh in favor of a custodial setting.

A police dominated atmosphere is determined, not by the number of police, but "whether the entire context of the questioning, including such considerations as place and length of the interrogation, demonstrates that the course of the investigation was police dominated." Griffin, 922 F.2d at 1352; e.g., Axsom, 289 F.3d at 502 (atmosphere not police dominated where nine agents came to the defendant's home to execute a search warrant, two agents conducted the interview and during the interview, the defendant sat on an easy chair, smoked his pipe, and the two interviewers sat across from him on a sofa). "Where a suspect is interrogated in the comfort and familiarity of his own home, a court is less likely to find the circumstances custodial." Id. (quoting United States v. Erving L., 147 F.3d 1240, 1247 (10th Cir. 1998)).

Mr. Haggerty was not interrogated in a police dominated atmosphere. The fact that four investigators went to Mr. Haggerty's residence is not dispositive of a police dominated atmosphere. He was interrogated in areas familiar to him including his dorm room and the common area of the dorm. The interrogation lasted for approximately thirty-five minutes and Mr. Haggerty was questioned primarily by Detective Masur and occasionally by a second officer.

Considering the totality of the circumstances, a reasonable person in Mr. Haggerty's shoes would not conclude that he was in custody. Therefore, he was

17

not entitled to a recitation of his <u>Miranda</u> right to be free from compulsory self-incrimination and his right to an attorney.

### B.      Whether Mr. Haggerty's Statements were Voluntary

Mr. Haggerty argues that his statements should be suppressed because they were given involuntarily. The defendant cites many purported reasons for this conclusion but does not support them with any authority. (Doc. 58, p. 10). The government argues that the statements were given voluntarily.

Statements are involuntary if they are "extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." <u>United States v. Lebrun</u>, 363 F.3d 715, 724 (8th Cir. 2004) (citing <u>Simmons v. Bowersox</u>, 235 F.3d 1124, 1132 (8th Cir. 2001)). "A statement is voluntary if it is the product of an essentially free and unconstrained choice by its maker." <u>United States v. Anaya,</u> 715 F.Supp.2d 916, 931 (8th Cir. 2010) (citing <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 225-26 (1973)).

The voluntariness of a confession is judged by the totality of the circumstances. <u>Anaya,</u> 715 F.Supp.2d at 932. The "conduct of the officers and the characteristics of the accused" are both considered in this determination. <u>Id</u>. It is important to note that "[a] statement cannot be rendered involuntary by the incapacity of the defendant alone; there must be some coercive police activity." <u>Id</u>. (citing <u>Colorado v. Connelly</u>, 479 U.S. 157, 164, 167 (1986)). The government bears the burden to prove by a preponderance of the evidence that the statements were voluntary. <u>LeBrun</u>, 363 F.3d at 724. Furthermore, a

18

defendant's mistaken belief that an offense cannot be prosecuted or is not prosecutable does not make a confession involuntary. <u>Lebrun</u>, 363 F.3d at 725.

Mr. Haggerty presented testimony from Dr. Stephen Manlove regarding whether Mr. Haggerty provided a false confession. Dr. Manlove opined that Mr. Haggerty's confession shouldn't be relied upon because Mr. Haggerty was sleep deprived and suffering from anxiety at the time of the interview. Dr. Manlove concluded that he was not certain if Mr. Haggerty's confession was a false confession or if it was a genuine confession. Dr. Manlove felt that additional evidence, coupled with Mr. Haggerty's confession, would be necessary in order to convict Mr. Haggerty. The issue before this court is not whether there is enough evidence to convict Mr. Haggerty. Instead, the issue is whether his statements were voluntary. Dr. Manlove's testimony does not establish that Mr. Haggerty's statements were involuntary.

The totality of the circumstances show that Mr. Haggerty gave his statements voluntarily. While he was not told that he was free to end the questioning, there is no evidence that Detective Masur and the other officers were aware that Mr. Haggerty did not know that he was not free to end the questioning and no evidence that they exploited that fact. The interview was calm and conversational, there was no physical intimidation, no threats made by the officers, no promises made to Mr. Haggerty, and no sign that Mr. Haggerty was suffering from any physical or mental impairment. Even if Mr. Haggerty was suffering from stress and lack of sleep, this was not something that Detective Masur and the other officers were aware of and not something

they exploited.  The court finds that Mr. Haggerty's statements were voluntary and should not be suppressed.

## V. Whether Mr. Haggerty Voluntary Consented to the Search

Mr. Haggerty argues that he did not voluntarily consent to the search and seizure of the items taken from his residence. He states that any alleged consent was the product of duress or coercion, express or implied. He lists several different factors that allegedly go to showing his consent was not voluntary. The government argues that Mr. Haggerty voluntarily consented to the search.

An individual gives voluntary consent to search if the consent is the "product of an essentially free and unconstrained choice, rather than the product of duress or coercion, express or implied." United States v. Galvan-Muro, 141 F.3d 904, 907 (8th Cir. 1998) (citing United States v. Chaidez, 906 F.2d 377, 380 (8th Cir. 1990)). Voluntariness is determined upon the totality of the circumstances including "both the characteristics of the accused and the details of the interrogation." Chaidez, 906 F.2d at 380-381 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973)). The factors are not applied mechanically, but are valuable in guiding the analysis. Chaidez, 906 F.2d at 381 (citing United States v. Sokolow, 490 U.S. 1, 6 (1989)).

Relevant characteristics of the person giving consent are that person's age, general intelligence and education, whether that person consented while intoxicated or under the influence of drugs, whether the person "consented after being informed of [his or her] right to withhold consent or of their Miranda

20

rights," and "whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system." Chaidez, 906 F.2d at 381 (internal citations omitted).

The environment in which the person was questioned is also relevant. Id. This includes whether the person was subjected to lengthy detention and questioning, "threatened, physically intimidated, or punished by the police," "relied upon promises or misrepresentations made by the police," "was in custody or under arrest when the consent was given," in a public or secluded place, or "objected to the search or stood by silently while the search" was conducted. Id.

After considering the testimony presented during the evidentiary hearing, the court rejects the majority of Mr. Haggerty's rendition of the facts as set forth in his brief (Doc. 58, p.10). The remaining facts as set forth by Mr. Haggerty in his brief, when viewed in the totality of the circumstances fail to establish that his consent was involuntary.

The totality of the circumstances show that Mr. Haggerty gave voluntary consent to the search. Mr. Haggerty is an adult in his early twenties. He was pursuing a college education and, as a result, is presumably fairly well educated and intelligent. Mr. Haggerty did not allege that he was under the influence of any substances when he gave consent and there are no facts to suggest that he was under the influence or intoxicated when he gave consent to law enforcement to search his residence and seize his electronic devices. He was privately interviewed for thirty-five minutes, asked questions about when

21

his electronics would be returned to him and expressed the desire to have the search completed as soon as possible. Moreover, he offered to show the officers where his electronics were located. This consent was given after Detective Masur advised that Mr. Haggerty did not have to give consent for the search. In the phone call to Mr. Haggerty, Detective Masur explained to Mr. Haggerty that he wanted to search Mr. Haggerty's entire residence and seize electronic devices to look for evidence relating to the "crime of child pornography." During the telephone call, Mr. Haggerty consented to the search.  The court finds that Mr. Haggerty's consent was voluntary and the items seized as a result thereof should not be suppressed.

## **CONCLUSION**

It is respectfully recommended that Mr. Haggerty's motion to suppress be denied in its entirety.

## **NOTICE TO PARTIES**

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.  *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665 (8th Cir. 1986).

DATED this 14th day of October, 2015.

BY THE COURT:

DANETA WOLLMANN
United States Magistrate Judge

22